**NATIONAL MOLASSES COMPANY, a corporation, Appellant,**

v.

**Wayne HERRING, d/b/a Herring Sales, Appellee.**

**No. 15172.**

United States Court of Appeals
Eighth Circuit.

April 26, 1955.

Rehearing Denied May 23, 1955.

John R. Moberly, Kansas City, Mo. (Carl E. Enggas, George Schwegler, Jr., and Watson, Ess, Marshall & Enggas, Kansas City, Mo., were with him on the brief), for appellant.

Robert L. Jackson, Kansas City, Mo. (Solbert M. Wasserstrom, Kansas City, Mo., was with him on the brief), for appellee.

Before SANBORN, COLLET and VAN OOSTERHOUT, Circuit Judges.

SANBORN, Circuit Judge.

This appeal is from a judgment entered upon a directed verdict in favor of the plaintiff (appellee) in an action brought by him to recover damages for the alleged breach by the defendant (appellant) of a contract for the sale of molasses. Jurisdiction was based on diversity of citizenship and amount in controversy, the plaintiff being a citizen of the State of Missouri, and the defendant a Pennsylvania corporation with executive offices in Oreland, Pennsylvania.

The claim upon which the plaintiff's action was based was that he had a written contract with the defendant dated April 11, 1950, by the terms of which the defendant agreed to sell him 25 tank cars of blackstrap molasses at a price of 7½¢ a gallon during the months of April, May and June, 1950, and 8¢ a gallon during July, August and September, 1950, the tank cars to be shipped according to shipping instructions furnished by the plaintiff during the months of April to September, 1950, inclusive; that the defendant failed to deliver 11 of the 25 tank cars of molasses it had contracted to deliver and which the plaintiff had ordered during the period specified in the contract; and that the plaintiff, to meet his commitments, had had to buy 11 tank cars of molasses on the open market at a price greatly in excess of the contract price.

The defendant in its answer asserted that its contract with the plaintiff, if any, was evidenced by a written confirmation of sale dated April 11, 1950, and sent to the plaintiff on that date; that by the terms of the confirmation of sale, which covered 25 tank cars of molasses at 7½¢ per gallon during April, May and June, 1950, and at 8¢ per gallon from July 1 to September 1, 1950, shipments were to be made according to shipping instructions received from the plaintiff prior to September 1; that during the months prior to September 1, 1950, the plaintiff gave orders and instructions for the shipment of 14 tank cars of molasses, which were shipped in accordance with the terms of the defendant's confirmation of sale; that after September 1, 1950, the plaintiff demanded the delivery of 11 cars of molasses at the price specified in the defendant's confirmation, but that the defendant rightfully refused to extend its undertaking beyond September 1, 1950.

The issue which was tried was, in effect, whether the contract between the parties was as evidenced by a "Purchase Order" dated and sent by the plaintiff to the defendant April 11, 1950, permitting the ordering of 25 cars of molasses through September, 1950, or by a "Confirmation of Sale" sent by the defendant to the plaintiff on the same day, fixing September 1, 1950, as the cut-off date for the ordering of shipments.

The record shows that the plaintiff had been in the feed brokerage business since October, 1945; that in some instances he bought and sold for his own account; that prior to April, 1950, he was the only broker selling molasses for the defendant in the Kansas City area; that the defendant was then operating from Pennsylvania; that the plaintiff's dealings with the defendant were almost entirely with a Mr. Fisher; that on April 11, 1950, Fisher called the plaintiff and suggested that he "would book us [the plaintiff] 50 tanks of molasses for shipment at the one price, April through June, at the other price July through

September," and that the molasses would be guaranteed against decline in price.

The record further shows that the plaintiff on April 11, 1950, mailed to the defendant a "Purchase Order" No. 2738 for 25 tank cars of molasses, F.O.B. New Orleans, Louisiana, at a price of 7½¢ per gallon during "April, May, June," and 8¢ a gallon during "July, Aug., Sept.,— Price Guaranteed against decline (Less $15.00 tank Brokerage)"—"Ship to: Directions Later"; that the order contained this printed notation:

"Important:

"Place our order number on all invoices. In drawing draft, draw Union National Bank, Kansas City, Missouri. Mail us copy of invoice when draft is drawn, otherwise mail invoice in duplicate.

"Please sign and return attached copy to us."

The record also shows that on April 11, 1950, the defendant mailed the plaintiff a "Confirmation of Sale", which, so far as material, reads as follows:

"We are pleased to confirm herewith your valued order, as follows:
Article: Kane Syro Feeding Molasses (Blackstrap Cane Molasses)
Quantity: 25 tank cars.
Price: 7½¢ per gallon FOB New Orleans, La. April, May, June 1950
8¢ per gallon FOB New Orleans, La. 7/1/50 to 9/1/50
Destination: various R. R. Delivery
Terms: S/D—draw on Herring Sales Co. unless otherwise instructed.
Shipments: Buyer's instructions to 9/1/50
Remarks: Price guaranteed against Seller's decline to date of shipment. This contract not transferrable.";

that, upon receipt by the plaintiff of the "Confirmation of Sale", it was given the same number as the "Purchase Order", namely "2738", and the date "9/1/50" after "Price" was underscored, probably by the plaintiff himself; that the defendant did not sign and return a copy of the "Purchase Order" to the plaintiff; that the defendant did not credit the plaintiff with any brokerage; that it did place on its invoices for cars of molasses shipped on the plaintiff's directions: "Your Order No. 2738"; that that number also appeared on shipping instructions given by the plaintiff to the defendant; that on the plaintiff's "Shipping Instructions" of August 28, 1950,—directing the defendant to ship one tank car of molasses to Emporia, Kansas,—under the heading "Remarks" appears, "This leaves directions due on 11 tanks, this contract"; that during July and August, 1950, the plaintiff had telephone conversations with Fisher, who indicated the necessity of cancelling orders for some of the cars of molasses; that the plaintiff advised him that he (plaintiff) had sold the molasses and that he could not get his customers to cancel their orders; that Fisher told the plaintiff, at the time, that he (Fisher) was quite far behind on shipments and was in no hurry for any additional shipping instructions; that Fisher, in a conversation with the plaintiff a few days prior to August 25, 1950, said there was not the molasses to deliver on the sales that had been made, and that he was going to have to reduce the deliveries on all open contracts because he did not have the molasses; that thereafter the plaintiff gave shipping instructions during August, 1950, on other cars, the last car shipped carrying an invoice date of September 9; that by letter of August 25, 1950, to the plaintiff, acknowledging receipt of shipping instructions for one tank car and calling attention to the fact that the correct balance of undelivered cars on contract No. 2738 was 15 cars, the defendant advised that it had found it necessary to reduce its outstanding bookings by 20%, due to the critical market situation, and that it was carrying a balance on the plaintiff's contract of 12 cars instead of 15; that the plaintiff had other contracts with the defendant for the purchase of molasses, which it fulfilled; that on September 1 the plaintiff

purchased from other sources five tank cars of blackstrap molasses at 20¢ a gallon to apply against an equal number of tank cars due from the defendant under the contract in suit; that this was done at the time the defendant refused to ship more tank cars; that the plaintiff purchased more tank cars of molasses later from other sources at still higher prices; that on September 5 the plaintiff asked the defendant to ship a car of molasses, and received a wire that the contract had been cancelled.

The plaintiff was the only witness who testified. At the close of the evidence, each side moved for a directed verdict. The court granted the motion of the plaintiff. It subsequently denied a motion of the defendant for judgment notwithstanding the verdict or, in the alternative, for a new trial. This appeal followed.

■ The trial court was evidently convinced that the plaintiff had proved conclusively that the defendant had accepted the terms of the "purchase order" and was, as a matter of law, liable to the plaintiff for breach of the contract. The difficulty with that conclusion is that, in determining whether the plaintiff was entitled to a directed verdict, the District Court was required to view the evidence in the light most favorable to the defendant and most unfavorable to the plaintiff, and to give to the defendant the benefit of every inference that reasonably could be drawn in its favor. The general rules for determining whether a trial court was justified in directing a verdict have been so fully and so frequently stated that there is no justification for repeating them, but see Coca Cola Bottling Co. of Black Hills v. Hubbard, 8 Cir., 203 F.2d 859, 860, and cases cited; and Hoyt v. Clancey, 8 Cir., 180 F.2d 152, 154–155.

■ What frequently seems to be overlooked in cases such as this is that where inconsistent inferences reasonably may be drawn from undisputed evidentiary facts, it is for the jury, and not the court, to determine which inference shall be drawn. Coca Cola Bottling Co. of Black Hills v. Hubbard, supra, at page 860 of 203 F.2d.

■ The burden was on the plaintiff to prove, by a fair preponderance of the evidence, that he had a contract under which the defendant was required to accept orders during September, 1950, for the 11 cars of molasses remaining undelivered on September 1, 1950.

The plaintiff points to the facts that his order conformed to his telephone conversation with Fisher and that the defendant on its invoices and communications with the plaintiff used the number which appeared on the "purchase order", as indicative of the defendant's acceptance of that order according to its terms. The defendant, on the other hand, in support of its contention that its confirmation of sale specified the terms and conditions of its undertaking to furnish the plaintiff with tank cars of molasses, directs attention to the facts (1) that it never returned a copy of the purchase order to the plaintiff, as requested by the terms of the order, (2) that it did not pay or credit the plaintiff with any brokerage on the cars shipped, and that no demand for brokerage was made by the plaintiff, (3) that the plaintiff had underscored "9/1/50" where it appeared on the confirmation of sale, and (4) that the plaintiff had attached to his first amended complaint, which was received in evidence as an admission against interest, photostatic copies of both the purchase order of April 11, 1950, and the confirmation of sale of the same date. The case was actually tried upon the issues tendered by the second amended complaint, which did not have attached to it a copy of the confirmation of sale.

If this case had been tried to the court without a jury, a finding either that the defendant had accepted the terms of the purchase order or that it had not accepted such terms would, we think, under the evidence, have been sustainable. This because the court would have been the trier of the facts.

■ It is our opinion, however, that the issue whether the defendant had

agreed to the terms of the purchase order or whether the plaintiff had accepted the terms of the defendant's confirmation of sale was, under the evidence, an issue of fact for the jury, and not an issue of law for the court.

If the trial court had reserved its ruling on the motions for the direction of verdicts, and had submitted the case to the jury, an appeal from whatever judgment was ultimately entered, whether a judgment upon the verdict of the jury. or a judgment notwithstanding the verdict, would have ended this case. As matters stand, all that this Court can do is remand the case for a new trial.

The judgment appealed from is reversed and the case remanded with directions to grant the defendant a new trial.